**LIPPY, Appellant,**

v.

**SOCIETY NATIONAL BANK et al., Appellees.**

[Cite as *Lippy v. Soc. Natl. Bank* (1995), 100 Ohio App.3d 37.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

Decided Jan. 17, 1995.

*James E. Burns* and *Edward F. Siegel,* for appellant.

*Walt Linscott* and *Michael A. Cyphert; Robert S. Fulton,* for appellee Society National Bank.

*Richard P. McLaughlin* and *Robert J. Herberger,* for appellee Universal Asbestos Management.

JOSEPH E. MAHONEY, Judge.

Plaintiff-appellant, Stephen R. Lippy, appeals from the trial court's judgment granting the directed verdict motions of defendants-appellees, Society National Bank ("Society") and Universal Asbestos Management, Inc. ("UAM"), made after appellant's opening statement. Having found merit to appellant's appeal, we reverse.

On September 19, 1991, appellant Lippy, on behalf of himself and on behalf of North Mar Center V ("North Mar"), an Ohio general partnership, filed a two-count complaint sounding in negligence against Society and UAM.

The facts set forth in the complaint are as follows: Lippy contacted Society to finance the purchase of the Unirental property (an old, run down, abandoned gas station which a company was using to rent tools and equipment). Society conditioned its financing on an appraisal and an environmental site assessment.

Society gave appellant the names of two appraisers it used and the name of UAM to do the environmental site assessment. Society contacted UAM which, in turn, contacted appellant. UAM's experience was limited to asbestos abatement, and it had no previous experience in the type of environmental site assessment appellant needed. Nevertheless, appellant and the seller entered into a contract with UAM to perform the site assessment. UAM performed the assessment and issued its report wherein it concluded that "there are no environmental hazards present, and that at this time there are no problems with the underground fuel tanks" at the Unirental property. Society financed the purchase of the property. Subsequently, when the underground storage tanks were removed, extensive soil, surface and groundwater contamination was found.

In count one of the complaint, appellant alleged Society was negligent in its acts and omissions in conducting the financial arrangements for the purchase of the Unirental property, and its negligence proximately caused injury to appellant Lippy and North Mar. Appellant alleged that, by conditioning loan approval upon an environmental site assessment performed by UAM, Society caused appellant to rely on an unqualified environmental consultant's opinion and evaluation, which evaluation was the proximate cause of appellant's injury. Appellant further alleged Society owed a duty of care toward appellant in recommending a competent environmental consultant and breached that duty in failing to use reasonable care in endorsing UAM for the site assessment of the Unirental property.

In count two of the complaint, appellant alleged that UAM was negligent in performing the environmental site assessment of the Unirental property.

Under both counts, the alleged damages suffered included remediation costs, economic loss, revenue loss, and loss of profits or impairment of earning capacity.

On June 4, 1992, the case proceeded to trial. At the conclusion of appellant's opening statement, appellees, respectively, moved for a directed verdict on the opening statement.

On June 15, 1992, the trial court filed its judgment entry, including opinion and findings, granting appellees' motions for a directed verdict.

Appellant filed a timely appeal. In a judgment entry dated May 24, 1993, this court reversed the trial court's judgment granting Society's motion for directed verdict, but affirmed the trial court's granting of UAM's motion for directed verdict. *Lippy v. Soc. Natl. Bank* (1993), 88 Ohio App.3d 33, 623 N.E.2d 108.

On June 2, 1993, appellant filed a motion for reconsideration, arguing that this court erred in determining that appellant had failed to raise a claim of negligence based on Restatement of the Law 2d, Torts (1977) 126, Section 552, in the trial court and, thus, waived this argument. Appellant also argued that this court failed to fully consider the issue of whether there existed a nexus between North Mar and UAM that could serve as a substitute for privity and, thus, entitle North Mar to bring a cause of action in tort for economic damages suffered as a result of a breach of contract.

On June 3, 1993, Society also filed a motion for reconsideration requesting the dismissal of appellant's claims against Society.

On June 24, 1994, this court granted appellant's motion for reconsideration on both issues, denied Society's motion for reconsideration, and vacated its opinion and judgment pronounced in *Lippy v. Soc. Natl. Bank* (1993), 88 Ohio App.3d 33, 623 N.E.2d 108.

Appellant now presents two assignments of error.

Under the first assignment of error, appellant argues that the trial court erred in granting Society's motion for a directed verdict on appellant's opening statement.

A motion for a directed verdict is governed by Civ.R. 50. It is evident that a motion for a directed verdict may be made on the opening statement of opposing counsel, Civ.R. 50(A)(1); however, a trial court should exercise caution in sustaining such a motion on the opening statement of counsel. *Brinkmoeller v. Wilson* (1975), 41 Ohio St.2d 223, 70 O.O.2d 424, 325 N.E.2d 233. In ruling on a motion for a directed verdict, the court must construe the evidence in favor of the nonmoving party and determine whether reasonable minds could come to but one conclusion on the evidence submitted, that conclusion being adverse to the nonmoving party. Civ.R. 50(A); *Campbell v. Pritchard* (1991), 73 Ohio App.3d 158, 596 N.E.2d 1047, citing *Cox v. Oliver Mach. Co.* (1987), 41 Ohio App.3d 28, 534 N.E.2d 855. Thus, to sustain the motion, "it must be clear that all the facts expected to be proved, and those that have been stated, do not constitute a cause of action or a defense, and the statement must be liberally construed in favor of the party against whom the motion has been made." *Brinkmoeller* at syllabus.

Therefore, the issue to be determined is whether appellant's opening statement failed to state a claim of negligence against Society.

Appellant's opening statement focused on the relationship appellant had with Larry Stofira, an employee of Society, and a conversation appellant initiated with Stofira in July 1989. The opening statement asserted the following:

When appellant Lippy returned to the Warren area, Stofira cultivated a close business relationship with appellant. Stofira introduced appellant to area builders and helped appellant create a network in the hope that appellant would enter into a deal which Society could finance. Regarding the conversation of July 1989, appellant's counsel stated as follows:

"Well, in July 1989, Mr. Lippy went to Larry Stofira and said Larry, 'I got a problem. I have got this property. We have put it under contract'—and by the way, it was put under contract for purchase by Stephen R. Lippy Company which is customarily the way a buyer who is acting for somebody else holds up their purchase of the property. So you know, 'I am going to buy it, but someone else is actually going to buy it.'

"You will see the purchase contract that Mr. Lippy went to Mr. Stofira, 'Larry, I got a problem. I have got the money to do this deal. I have got this property identified. We spoke to the sellers. We come up with the price. It's a little high. We can live with the price. I want to know if Society wants to loan some of the money. The other concern I have is that it is a gas station. I don't know about the tanks. We have gone back and forth about how to figure out what the environmental condition of the property is. We don't know what to do. That's holding us up.' Stofira said, 'You need to do two things. You need to get the property appraised. If you want the bank to loan you any money, you need to get the property appraised. This is who you can use for appraisal.' Gave him two companies in the area to do company appraisal. Stephen chose one. Then Mr. Stofira said, 'You need to do an environment site assessment,' or some words like that. He wasn't familiar with the terms at the time, analysis site assessment. 'You need a site assessment.' 'What's that,' said Steve. Mr. Stofira gave a brief explanation of site assessment. Then he said, 'We have got somebody who does it.' He gave him the name of Universal Asbestos Management. Stephen said, 'Asbestos?' Mr. Stofira said, 'We worked with them in the past. I will have my guy call you. I will have my guy call you.'

"In the context of this transaction, Stephen came to Stofira and said, 'I have a problem.' Mr. Stofira, in effect, said 'Trust me. I will solve the problem for you,' and Mr. Stofira was good to his word. The next day, that day sometime very soon thereafter, Mr. Lippy got a phone call from Anthony Servone [sic]. Anthony Servone [sic] introduced himself as the friend of Larry Stofira's. 'I understand you need to do a site assessment.' They had a brief conversation.

"Mr. Stofira FAXed Mr. Lippy a proposal. 'This is what we are going to do for you. Mr. Lippy decided that this seemed to be a cost effective means of answering this big problem that was holding up the deal. They told us about the cost. Mr. Servone [sic], a month or so later, six weeks later, sent this report to Mr. Lippy and to the sellers that said he tested the ground water. He tested the

soils. 'We looked here. We looked there. We certify that there are no environment at [sic] problems or EPA violations on this property.' Great."

Appellant's counsel further stated that Society subsequently loaned the money based on the appraisal and the site assessment performed by UAM. Thereafter, when the underground storage tanks were being removed, it was discovered that the area was contaminated and required extensive clean up. Appellant's counsel described the problem:

"* * * They wound up having to take up three quarters of the soil on this site, in some places to a depth of twelve feet. This place was dirty. This place reeked. This place was a continuing environmental hazard. They were very surprised at what they found because they had trusted Society to choose somebody. They had trusted UAM to do the survey."

Counsel then explained:

"We are not here because their expectations were not fulfilled. We are not here because they were surprised. People don't get to be compensated simply because unexpected things happen to them. That's not the law. We are here today because Society Bank was negligent. We are here today because UAM was negligent. UAM was not qualified to do this work. UAM didn't even represent to the bank that they were qualified to do this work. UAM said to the bank, 'We are really good at asbestos related problems.' The bank had recently used UAM just prior to this on a job which had to do with an investigation of asbestos.

"Larry Stofira had no reason to believe UAM was qualified to do this work. Larry Stofira had no business telling Stephen Lippy he had to use UAM to do this work or to solve this particular problem he had. It was negligent of Larry Stofira to so choose this contractor for this vital job, and they knew that Mr. Lippy and his partners were going to rely on the information generated from this in order to know whether or not to buy the property."

Based on the foregoing opening statement, the trial court determined Society was entitled to a directed verdict because appellant failed to state a viable cause of action based on the holding of *Umbaugh Pole Bldg. Co. v. Scott* (1979), 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320. The court recognized that appellant's opening statement should be liberally construed and that caution should be exercised in directing a verdict on the opening statement. However, the court rejected appellant's argument based on *Stone v. Davis* (1981), 66 Ohio St.2d 74, 20 O.O.3d 64, 419 N.E.2d 1094, in that Society owed him a "special duty" because the relationship was one where appellant placed "special trust" in Society relying on Society for advice. The court found *Stone* was not applicable to invoke any

kind of "duty" sufficient to give rise to liability on the part of Society and that *Stone* was an exception to the general rule set forth in *Umbaugh.*

Appellant argues that the facts he outlined in his opening statement established a duty and breach of that duty by Society. We agree.

In *Umbaugh,* the court set forth the general rule regarding the debtor-creditor relationship at paragraph one of the syllabus:

"The relationship of debtor and creditor without more is not a fiduciary relationship. A fiduciary relationship may be created out of an informal relationship, but this is done only when both parties understand that a special trust or confidence has been reposed."

Thus, the general rule is that a mere debtor-creditor relationship without more does not create a fiduciary relationship. In *Stone,* the court set forth the exception to the general rule and found that a fiduciary duty existed between a bank and its loan customer where the bank gave advice on the subject of mortgage insurance during the mortgage loan process and, as a fiduciary, the bank was under a duty to disclose to the customer the mechanics of procuring mortgage insurance. In negligently failing to observe this duty, the bank may be found liable for any injury proximately caused to the customer. Citing *In re Termination of Employment* (1974), 40 Ohio St.2d 107, 115, 69 O.O.2d 512, 516, 321 N.E.2d 603, 608–609, the *Stone* court explained when a fiduciary duty arises:

" 'A "fiduciary relationship" is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.' " *Id.,* 66 Ohio St.2d at 78, 20 O.O.3d at 66, 419 N.E.2d at 1097–1098.

Following its earlier holding in *Umbaugh, supra,* the court in *Stone* explained that the fiduciary duty need not arise out of contract but may arise out of an informal relationship where both parties understand that a special trust or confidence has been reposed. Accord *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98, 519 N.E.2d 363.

Appellant's counsel set forth facts in his opening statement upon which he expected the evidence would prove that an informal relationship arose between appellant and Society and that both parties understood a special confidence or trust was reposed thereon. The facts allege that appellant came to Society with a problem and Society's agent Stofira, in effect, said, "Trust me. I will solve the problem for you," and he did. Appellant claimed that Stofira went beyond giving mere business advice that an environmental assessment was necessary and stated, "We have got somebody who does it," and identified UAM. When appellant questioned about, "Asbestos?" Stofira assured him, "We worked with

them in the past," and then went further. "I will have my guy call you. I will have my guy call you." The next day Stofira's "guy" called and introduced himself as the friend of Stofira. These facts allege a special confidence and trust in the fidelity and integrity of Society's agent Stofira, which resulted in a position of superiority or influence acquired by the special trust. Thus, a question of fact, as to whether an informal fiduciary relationship existed, was raised which, if later supported by evidence, would be for the jury's determination.

Appellant argues that even if the court is wary of imposing a fiduciary relationship, Society was under a common-law obligation to be non-negligent in imparting information upon which it knew appellant would rely. In support of this argument, appellant relies on *Haddon View Invest. Co. v. Coopers & Lybrand* (1982), 70 Ohio St.2d 154, 24 O.O.3d 268, 436 N.E.2d 212, wherein the Supreme Court of Ohio recognized negligent misrepresentation as the basis for a cause of action.

In *Haddon View,* the plaintiffs were individual limited partners who detrimentally relied upon an accounting firm's representations made to its client, the limited partnership. The court held "that an accountant may be held liable by a third party for professional negligence when that third party is a member of a limited class whose reliance on the accountant's representation is specifically foreseen." *Id.* at 157, 24 O.O.3d at 269, 436 N.E.2d at 215. The court also cited with approval 3 Restatement of the Law 2d, Torts (1977) 126, Section 552, which provides in part:

"(1) One who, in the course of his business, * * * supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2) * * * the liability stated in Subsection (1) is limited to loss suffered

"(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

"(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."

Applying *Haddon View* to the case *sub judice,* appellant's counsel has set forth facts in his opening statement which, if supported by evidence, would state a cause of action for negligent misrepresentation and, thus, withstand Society's motion for a directed verdict. It is undisputed that Society is in the business, *inter alia,* of financing commercial and consumer transactions and that its agent,

Stofira, was involved in the transaction with appellant. It is also self-evident that Society had a pecuniary interest in the above transaction. From Stofira's statement, "We have got somebody who does it," we believe that reasonable minds could infer that Stofira misrepresented that UAM was qualified to conduct the site assessment. Further, given that Society had recently used UAM to conduct an asbestos investigation, reasonable minds could infer that Society failed to exercise reasonable care in determining whether UAM was experienced or qualified to perform a general environmental site assessment. Finally, whether appellant justifiably relied upon Stofira's representations should be left for a jury's determination.

Accordingly, after construing the facts set forth in the opening statement most strongly in favor of appellant, the nonmoving party, we cannot conclude that reasonable minds would come to but one conclusion, and that conclusion is adverse to appellant. Thus, the directed verdict for Society was improper.

The first assignment of error is sustained.

Under the second assignment of error, appellant contends that the directed verdict for UAM was also improper.

On August 14, 1989, UAM entered into an agreement with appellant and the seller of the Unirental property to perform the environmental site assessment on the property. The contract defined the terms and conditions of the assessment. Upon completing the assessment, UAM issued a report to appellant and the seller. Society considered UAM's report in approving appellant's loan.

Approximately eighteen months after UAM performed the site assessment, North Mar discovered petroleum hydrocarbons on the property during an excavation of the underground storage tanks. Appellant asserted in the opening statement that the "place was a continuing environmental hazard."

The trial court directed a verdict for UAM based on the following three findings: (1) that there was no tort liability for a breach of contract, (2) that there was no privity of contract between North Mar and UAM, and (3) that appellant failed to state a claim. The court based its findings on *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.* (1990), 54 Ohio St.3d 1, 560 N.E.2d 206.

Appellant disputes the trial court's findings. First, appellant argues that privity existed because he was an agent acting on behalf of his partners, which is analogous to an agent acting on behalf of an undisclosed principal.

However, there was no partnership formed at the time appellant entered into a contract with UAM. The partnership was not formed until December 1989 and not recorded until January 1990. Furthermore, in his opening statement, appellant's counsel stated:

"Mr. Lippy's partners knew the gas station had potential for the environment problems and *didn't want to get involved in it*. What was Stephen to do? * * * He turned out to a man named Larry Stofira for advice." (Emphasis added.)

From this statement it appears that at the time appellant was seeking help for the potential environmental problems, the alleged partners "didn't want to get involved in it."

Appellant argues that *Floor Craft, supra,* is distinguishable because it involved design professionals and UAM is not a firm of design professionals. We disagree.

In *Floor Craft,* the plaintiff was a contractor that had installed flooring pursuant to a design by the defendant architectural firm. The material subsequently developed bubbles because the specified flooring and sealant were allegedly incompatible with the construction methods used in the project. The court held that since there was no direct contractual agreement between the contractor and the architectural firm, and there was no nexus that can serve as a substitute for contractual privity, the contractor failed to state a cause of action. The court concluded:

"[T]hat recovery for economic loss is strictly a subject for contract negotiation and assignment. Consequently, in the absence of privity of contract no cause of action exists in tort to recover economic damages against design professionals involved in drafting plans and specifications." *Id.,* 54 Ohio St.3d at 8, 560 N.E.2d at 212.

The court found *Haddon View, supra,* distinguishable on its facts and law, and noted that *Haddon View* only partially withdrew the privity requirement with respect to malpractice actions taken against accountants. *Id.,* 54 Ohio St.3d at 3–4, 560 N.E.2d at 208–209.

■ We find that although the case *sub judice* does not fit neatly within the confines of *Floor Craft,* it is sufficiently similar to find that there was no privity of contract as to North Mar. There was no direct contractual relationship between North Mar and UAM, nor was there any nexus that could serve as a substitute for contractual privity. UAM did not exercise any direct control or supervision over North Mar, nor was there any agency relationship between the parties. See *Clevecon, Inc. v. Northeast Ohio Regional Sewer Dist.* (1993), 90 Ohio App.3d 215, 628 N.E.2d 143 (holding that an architect's substantial amount of control in a design project was sufficient to raise a question of fact whether there was a nexus between the parties to substitute for privity of contract).

■ Next, appellant argues that since he was in privity with UAM, North Mar succeeds to the warranties expressed to appellant by UAM. Again, we disagree.

"In its broadest sense, 'privity' is defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right." Black's Law Dictionary (6 Ed.Rev.1990) 1199.

Privity of contract specifically refers to "[t]hat connection or relationship which exists between two or more *contracting parties*." (Emphasis added.) *Id.* Having already determined that there was no contractual connection or relationship between North Mar and UAM, there is no privity of contract despite any successive relationship to the same property. Hence, under *Floor Craft*, North Mar does not have a cause of action in tort for economic losses suffered as a result of any alleged breach of contract between appellant and UAM.

■ However, as to appellant individually, we believe a cause of action in tort for economic losses exists. It is undisputed that appellant was in privity of contract with UAM, and that North Mar holds title to the Unirental property. It is also undisputed that appellant is a partner of North Mar and, as such, appellant is "a co-owner with his partners of specific partnership property holding as a tenant in partnership." R.C. 1775.24(A). Hence, appellant maintains an undivided interest in the Unirental property and any economic loss to that property resulting from the breach of contract with UAM is suffered by appellant. Further, we find that facts set forth in the opening statements of appellant's counsel, if proven, were sufficient to support the negligence action brought by appellant individually against UAM.

Finally, appellant argues that contrary to the trial court's finding, appellant's counsel set forth in his opening statement that there was a "continuing contamination" of the property, which implies that the contamination continued over time, and that this blanket assertion of facts to be proven satisfies his burden to show facts which would support a verdict. While we agree with appellant that he sufficiently stated a negligence claim against UAM, both individually and on behalf of North Mar, appellant's remedy for economic losses is an action for breach of contract, and any duty owed to appellant by UAM was one owed under the contract. To the extent that North Mar has failed to allege a breach of contract claim against UAM, it has failed to state a claim upon which relief can be granted against UAM.

Accordingly, the directed verdict in favor of UAM was proper as to North Mar only.

The second assignment of error is with merit in part.

Based on the foregoing, the trial court's judgment granting a directed verdict in favor of UAM is affirmed as to North Mar and reversed as to appellant Lippy,

individually. The trial court's judgment granting a directed verdict in favor of Society is reversed.

This matter is remanded for further proceedings according to law and consistent with this opinion.

*Judgment accordingly.*

NADER, J., concurs.

CHRISTLEY, P.J., dissents.

CHRISTLEY, Presiding Judge, dissenting.

I again respectfully dissent from the majority opinion in reference to the first assignment regarding the liability of Society Bank. One, I find *Umbaugh Pole Bldg. Co. v. Scott* (1979), 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320, to be right on point. The trial judge was correct in finding that, as a matter of law, there were no facts put forth in the opening statement which created a "specific duty" and, thus, transformed the contemplated debtor/creditor relationship between the bank and Lippy into a fiduciary relationship.

As is pointed out in *Umbaugh*, the mere "rendering of advice by the creditor to the debtors does not transform the business relationship into a fiduciary relationship." *Id.* at 287, 12 O.O.3d at 282, 390 N.E.2d at 323. I note, also, that just as in *Umbaugh*, there was no property or interest of the appellant entrusted to the bank; there was no continuing relationship with the bank contingent upon following this advice; there was nothing to indicate that this was anything but an arm's-length transaction being contemplated and negotiated between an experienced business person and the bank. The sole basis for the claim was the bank's good-faith suggestion of a candidate to perform the environmental site assessment.

As was more recently expressed by the First District Court of Appeals,[1] there was "nothing in the circumstances as disclosed by the record that changed the relationship between the plaintiffs and Wilson from the standard one between mortgagor and servicing agent * * * into a fiduciary relationship. Certainly there was no mutual understanding that plaintiffs reposed a special confidence in Wilson or Northwestern, and we find no circumstances that would impose fiduciary duties as a matter of law."

---

1. *Warren v. Percy Wilson Mtge. & Fin. Corp.* (1984), 15 Ohio App.3d 48, 51, 15 OBR 76, 79, 472 N.E.2d 364, 367.

The majority relies heavily on *Haddon View* as being supportive of the theory that a special duty existed on Society's part. However, the facts in *Haddon View* are that the plaintiffs there were limited partners in a partnership which was *already* a client of the accounting firm. The issue of plaintiffs' standing in *Haddon View* was answered affirmatively even though there was no direct privity of contract between the accounting firm and the individual limited partners; the court found that it was reasonably foreseeable that the limited partners would rely upon the accounting work done for the partnership itself.

In the instant case, the plaintiffs were, at best, *prospective* clients and no contract had been entered into by the bank with *anyone* relative to the sale. Further, the professional advice given in *Haddon View* was directly related to the business of the defendant, *i.e.*, accounting, while here, the advice was not about banking or financing, but rather about an entirely collateral matter—who could conduct an environmental site assessment? *Haddon View* was essentially a professional malpractice case, the instant case is not.

It is also arguable that even if a special duty and a subsequent fiduciary relationship could somehow be contrived, the mere offering of bad advice by the bank on a matter collateral to the loan approval would not rise to the level of negligence. Taking on the role of a fiduciary does not make one a guarantor or insurer unless mandated by statute; instead, the fiduciary is required only to exercise the care and prudence of an ordinary man. See *Freeman v. Norwalk Cemetery Assn.* (1950), 88 Ohio App. 446, 45 O.O. 231, 100 N.E.2d 267, paragraph three of the syllabus.

In a situation where a fiduciary relationship is created by the facts of the relationship rather than by statute, *some act of negligence* must be established in order to create liability. What negligence has been shown here? The facts are that the bank had previously dealt successfully with UAM. Where is it shown that the bank should have foreseen that UAM would subsequently prove to be incompetent?

The majority's reliance on *Stone v. Davis* (1981), 66 Ohio St.2d 74, 20 O.O.3d 64, 419 N.E.2d 1094, is also misplaced. There, a *residential* loan was at issue. I see that as a significant distinction from the instant case where a commercial transaction was contemplated.

Further, the *Stone* court itself pointed out that "while a bank and its customer may be said to stand at arm's length in negotiating the *terms and conditions* of a mortgage loan, it is unrealistic to believe that this *equality of position* carries over into the area of loan processing * * *." (Emphasis added.) *Id.* at 78–79, 20 O.O.3d at 67, 419 N.E.2d at 1098.

In the instant case, appellant and the bank officer were engaged in *preliminary* negotiations concerning the procurement of a commercial loan. Nothing more was at issue. Even the *Stone* court recognizes an "equality of position" under these circumstances. The bank's recommendation of the use of UAM was not, even by the most liberal reading of the opening statement, a "term" or "condition" much less part of any subsequent "loan processing." Further, it was not even a negotiated issue. Read in context, it was clearly a suggestion, nothing more.

In addition, in *Stone*, the facts indicated that the federal truth-in-lending regulations involving the "duty of disclosure" created the "special duty" owed to a customer seeking mortgage insurance. No such statutory obligation existed in the instant case.

Nevertheless, there is no need to reach any conclusion as to negligence because there were no indications of record that this was other than an arm's-length commercial debtor-creditor negotiating session; there was no allegation that Lippy could only deal with Society, or that other dealings with Society were contingent upon placing this loan with Society, or that Society required him to deal with UAM as a condition of the deal. Even if Lippy may have thought so, there is nothing of record demonstrating the existence of any *mutual* understanding with Society which engendered this special trust or confidence, or that it was reasonable of Lippy to read a fiduciary relationship into his prospective dealing with Society. This was at most a classic example of networking, "I know a guy who * * *."

To impose such an interpretation on the facts outlined in appellant's opening statement, in essence, would change the established law regarding the presumed *non*fiduciary relationship which currently exists between banks and their prospective and current commercial borrowers. This is particularly so when the advice given does not even reference banking or financial matters.

Therefore, I would find that as a matter of law, there were no facts which would have created a fiduciary relationship out of the prospective debtor-creditor relationship put forth in appellant's opening statement. I would, therefore, affirm the trial court on the first assignment.