[Cite as *Geiler Co. v. Hamilton Cty. Pub. Library Bd. of Trustees*, 2024-Ohio-5793.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| THE GEILER COMPANY, | : | APPEAL NO. | C-240162 |
| | | TRIAL NO. | A-2102261 |
| Plaintiff-Appellant, | : | | |
| vs. | : | | |
| BOARD OF TRUSTEES OF THE | : | | |
| PUBLIC LIBRARY OF CINCINNATI | | *O P I N I O N* | |
| AND HAMILTON COUNTY, | : | | |
| Defendant-Appellee. | : | | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 11, 2024

*Wood & Lamping LLP* and *C.J. Schmidt*, for Plaintiff-Appellant,

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Michael J. Friedmann*, Assistant Prosecuting Attorney, for Defendant-Appellee.

**ZAYAS, Judge.**

**{¶1}** In this breach-of-contract action, plaintiff-appellant The Geiler Company ("Geiler") appeals from the judgment of the Hamilton County Court of Common Pleas, declining to rule in its favor on its claims against defendant-appellee Board of Trustees of the Public Library of Cincinnati and Hamilton County ("the library") for breach of contract and negligent misrepresentation. Geiler raises two assignments of error challenging the trial court's decision as to each claim. For the reasons that follow, we overrule both assignments of error and affirm the judgment of the trial court.

## I. The TC-05 Contract

**{¶2}** On April 8, 2019, the library (as the "owner") entered into a contract with Geiler (as the "contractor") for "TC-05—HVAC Upgrades" ("the contract"). The contract listed the engineer on the project as Motz Consulting Engineers, Inc., ("Motz"). The contract provided that Geiler "shall fully execute the Work described in the contract documents, except as specifically indicated in the Contract Documents to be the responsibility of others." Among an abundance of other things, Geiler was responsible for installation of prepurchased Air Handling Units ("AHUs"). Each AHU was to be "fabricated so that it can be delivered in proper shipping sections and will be complete [sic] knocked down at the site to permit entry through openings in the buildings." Geiler, as the HVAC contractor, was "responsible to coordinate shipping sections and knock down and reconstruction with the manufacturer."

**{¶3}** Addendum 1 to the contract provides, "This addendum supplements and amends the project manual and drawings, shall be taken into account in preparing proposals, and shall become a part of the contract documents." Addendum 1 includes "clarifications" based on questions asked at the prebid meeting. Of relevance, the

addendum provides an answer to the question, "Are the units sized according to the job?" The answer states, "yes the unit reps have walked the spaces, understand the limitations and have worked with the engineer to size the units to accommodate the tight working conditions."

{¶4} Addendum 1 further includes the agenda for the prebid meeting. The agenda includes a "Scope of Work overview" list. Of relevance, the list states, "Equipment has been prepurchased and will be shipped to Cincinnati. Contractor shall coordinate all shipping with manufacturer's [sic] (EAP-AHUs, and boilers—Blackmore and Glunt). Contractor shall receive, rig, install, start up, commission equipment as though it is their own." The list also states, "Contractors shall make themselves aware of the pathways necessary to rig the equipment into place (boilers may require removal of doors and portion of walls; AHU's will need to be completely knocked down, rigged into place, and re constructed [sic])."

## II.    *Events After the Contract*

{¶5} In August 2019, EAP—the AHU manufacturer—sent an email to individuals from Motz, Geiler, and the library, indicating the AHUs would be "delivered assembled but, without the sealant." The email said, "This will make the disassembly easy. Geiler will be able to break them down as small as they need to get them to the final location."

{¶6} Doug Weberding, the project manager from Geiler, was included in the email. Weberding forwarded the email to Jeff Gerrein from the library and said, "This is not ours to disassemble. We were told they would be in sections and fit through the doors. We don't have labor to disassemble these units."

{¶7} Gerrein forwarded the email to two individuals from Motz—Michael Murdock and Cody Fralick—with a note that said, "fyi." Murdock forwarded the email

to Fralick and two others from Motz—Dave Wahoff and Jeff Haynay—with a message that said, "Guys—what did we say in the spec? I assumed they would come in individual pieces? Modular?"

**{¶8}** Haynay responded to the email, adding Gerrein and Weberding to the email, and said, "All please see attached spec section and pre-bid meeting minutes. It is clearly called out in both that the AHU's [sic] would need to be knocked down at the site and that the shipping sections and reconstruction of the units would need to be coordinated with the manufacturer."

**{¶9}** In October 2019, the AHUs arrived. That same month, Ron Powell from Motz forwarded the above-mentioned emails to Weberding and said, "After reading the project documents it is clear the rigging and assembly of the air handler [sic] were discussed several times and is the responsible [sic] of the mechanical contractor. Please see excerpts below." The email then referenced the above-mentioned provisions of the contract indicating that the AHUs would need to be completely knocked down.

**{¶10}** Eventually, on March 27, 2020, Weberding sent a letter to the library regarding "Air Handler Disassembly and Reassembly Costs." The letter said:

> This is to let you know that as [sic] Friday 3/27/20 The Geiler Company has finished the last AHU installation for the Hamilton County Project. It is still our position that the disassembly and reassembly of the Air Handling Units is a clearly recompensable change order based on the documents provided during the bid period. The final approved submittals on the owner provided AHU's [sic] was not received by Geiler until June 2019, well after we received the contract.
>
> Attached is the estimated change order cost to date for the

4

disassembly, reassembly and Electric. It is based on 320 pipefitter hours per unit to perform the work.

Total cost is $270,238.16. We would assume that you want to meet with management of Geiler at the first opportunity. Please indicate your availability.

**{¶11}** The library ultimately declined to provide the requested additional compensation.

### III.  Procedural History

**{¶12}** In July 2021, Geiler initiated the instant action against the library, asserting claims for breach of contract and negligent misrepresentation. The breach-of-contract claim asserted that the library materially breached the contract by failing to ensure that the AHUs arrived in a manner "suitable for ingress into the Project property." The negligent-misrepresentation claim asserted that Geiler justifiably relied on the library's misrepresentation that the AHUs would "arrive in a manner that allowed for easy ingress into the Project property."

**{¶13}** The cause eventually proceeded to a three-day bench trial in December 2023, during which the trial court granted a directed verdict on Geiler's claim for negligent misrepresentation at the close of Geiler's case-in-chief. In February 2024, the trial court entered judgment in favor of the library on Geiler's claim for breach of contract. Geiler now appeals.

### IV.  Law and Analysis

#### A.  First Assignment of Error

**{¶14}** In its first assignment of error, Geiler challenges the trial court's denial of its claim for breach of contract.

**{¶15}** The trial court denied Geiler's breach-of-contract claim after finding

that Geiler was contractually required to knockdown the AHUs into the size needed to get through the pathways, and was contractually required to obtain a change order and provide the library notice of its claim if it believed that the knockdown work was outside the scope of the original contract.

{¶16} Geiler challenges these findings, arguing that the contract provided that the AHUs would arrive disassembled and that it provided proper notice of its claim under the contract.

{¶17} Because we find the notice issue dispositive of this assignment of error, we address that issue first.

{¶18} Section 9.1 of the contract provides, "The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of Work under the Contact Documents."

{¶19} In its breach-of-contact claim, Geiler sought a monetary award of the increase in costs "in excess of that which was contemplated per the terms of the contract." In other words, Geiler was seeking additional costs related to the work it performed. Thus, consistent with the March 27, 2020 letter, Geiler was seeking an increase in the Contract Sum.

{¶20} After trial, the trial court found that the Contract Sum remained fixed as Geiler failed to provide the requisite notice of its claim[1] under Sections 15.1.2 and 15.1.4 of the contract where Geiler did not provide the notice of its claim to the library until March 27, 2020, after Geiler had completed the work.

---

[1] Section 15.1.1 of the contract provides:
> A claim is a demand or assertion by one of the parties seeking, as a matter of right, payment of money, or other relief with respect to the terms of the Contract. The term 'claim' also includes other disputes and matters in question between the Owner and the Contractor arising out of or relating to the Contract. The responsibility to substantiate Claims shall rest with the party making the claim.

**{¶21}** Section 15.1.2 of the contract provides:

Claims by either the Owner or Contractor must be initiated by written notice to the other party and to the Initial Decision Maker[2] with a copy sent to the Architect, if the Architect is not serving as the Initial Decision Maker. Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later.

**{¶22}** Section 15.1.4 of the General Conditions of the contract provides, "If the contractor wishes to make a Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work."

**{¶23}** Geiler argues that the trial court erred in finding that it failed to provide the requisite notice of its claim under the contract where it "properly and timely asserted a claim" in the August 2019 email from Weberding to Gerrein.

**{¶24}** "Although the interpretation of a written contract poses a question of law that we review de novo, where the appellant challenges the trial court's factual findings, we apply a manifest-weight-of-the-evidence standard." *Washington v. Am. Gen. Life Ins. Co.*, 2022-Ohio-339, ¶ 13 (1st Dist.), citing *Qiming He v. Half Price Heating & Air*, 2021-Ohio-1599, ¶ 6 (1st Dist.). "Under this standard of review, we 'weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered.'" *Id.*, citing *Qiming* at ¶ 7. "'In weighing the

---

[2] Under the terms of the contract, Motz was to serve as the initial decision maker.

evidence, we "must always be mindful of the presumption in favor of the finder of fact.""" *Id.*, quoting *Qiming* at ¶ 7.

{¶25} The trial court found that Weberding's email was not "a notice of claim" as it failed to, at least, put the library on notice that Geiler was going to make a claim and provide an estimate of the cost.

{¶26} As previously mentioned, the email from Weberding was sent in response to an email from the manufacturer about the arrival condition of the AHUs, and said, "[The AHUs are] not ours to disassemble. We were told they would be in sections and fit through the doors. We don't have labor to disassemble these units." The email did not contain any express assertion of any right to additional payment under the contract or demand any other form of relief.

{¶27} At trial, Weberding agreed in his testimony that the email was sent prior to the AHUs arriving. Significantly, he denied submitting a formal claim once the AHUs arrived in October 2019. Instead, he agreed that Geiler's formal claim was the March 2020 letter, which was sent once "all the units were done."

{¶28} Additionally, William Geiler—the vice president of Geiler—testified that the March 2020 letter was the "initial notification" of what Geiler felt the additional assembly costs would be.

{¶29} Further, David Wahoff—the engineer for Motz—denied in his testimony that the email asked for an additional contract sum or made a claim for additional compensation.

{¶30} Based on this evidence, we cannot conclude that the trial court clearly lost its way and created a manifest miscarriage of justice when it found that the email did not serve as notice of Geiler's claim for an increase in the Contract Sum. *See generally Eastley v. Volkman*, 2012-Ohio-2179, ¶ 21, quoting *Seasons Coal Co., Inc.*

8

*v. Cleveland*, 10 Ohio St.3d 77 (1984) ("'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'").

**{¶31}** Beyond that, the March 2020 notice that Geiler sent to the library was not provided prior to Geiler executing the work, nor was it sent within 21 days after Geiler was on notice of the disassembly issue or within 21 days after the AHUs arrived from the manufacturer. Consequently, because the March 2020 notice does not comply with the contractual requirements for asserting a claim for an increase in the Contract Sum, we cannot find error in the trial court's determination that Geiler failed to provide the requisite notice of its claim under Sections 15.1.2 and 15.1.4 of the contract in order to prevail on its claim for breach of contract. Accordingly, we overrule the first assignment of error and affirm the judgment of the trial court as to Geiler's claim for breach of contract.

### B. Second Assignment of Error

**{¶32}** In its second assignment of error, Geiler argues that the trial court erred in granting the library's motion for a directed verdict on its claim for negligent misrepresentation.

**{¶33}** As an initial matter, in a bench trial, "a motion for judgment at the conclusion of the plaintiff's evidence is one for dismissal under Civ.R. 41(B)(2), not a motion for a directed verdict under Civ.R. 50." *Beal v. Bauer*, 2014-Ohio-614, ¶ 8 (1st Dist.), citing *St. Clair v. Person*, 2002-Ohio-1129 (1st Dist.).

**{¶34}** The library moved for a "directed verdict" at the close of Geiler's case, rather than a dismissal, and the trial court said that it was granting the motion. While this is technically improper in a bench trial, "courts reason that no prejudice results

from the erroneous application of the directed verdict standard because the standard is "'much more rigorous than the involuntary dismissal standard,'" and thus, "'satisfaction of the Civ.R. 50(A) standard implies satisfaction of the Civ.R. 41(B)(2) standard.'"" (Citation omitted.) *Jarupan v. Hanna*, 2007-Ohio-5081, ¶ 10 (10th Dist.). Consequently, the trial court's granting of the library's motion for a directed verdict was harmless error, so long as dismissal was appropriate under Civ.R. 41(B)(2).

**{¶35}** In relevant part, Civ.R. 41(B)(2) provides:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of the plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

**{¶36}** "Civ.R. 41(B)(2) allows a trial court to determine the facts by weighing the evidence and resolving any conflicts therein." (Citations omitted.) *Jarupan* at ¶ 9. "If, after evaluating the evidence, a trial court finds that the plaintiff has failed to meet [his or] her burden of proof, then the trial court may enter judgment in the defendant's favor." *Id.*

**{¶37}** This court must uphold a dismissal under Civ.R. 41(B)(2) "unless we find it to be erroneous at a matter of law or against the manifest weight of the evidence." *Beal*, 2014-Ohio-614, at ¶ 9 (1st Dist.), citing *Goering v. Chriscon Builders, Ltd.*, 2011-Ohio-5480, ¶ 16 (1st Dist.).

**{¶38}** The tort of negligent misrepresentation:

provides that "one who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, *supplies false information* for the guidance of others in their business transactions, is subject to liability for economic loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

(Emphasis in original.)  *Universal Contr. Corp. v. Aug*, 2004-Ohio-7133, ¶ 11 (1st Dist.), quoting *Delman v. Cleveland Hts.*, 41 Ohio St.3d 1, 4 (1989).  "In negligent-misrepresentation claims, the scope of the special duty and the scope of the permissible recovery will vary on a case-by-case basis." *Id*. at ¶ 16.

**{¶39}** Geiler's negligent-misrepresentation claim is premised on the assertion that the library is liable for making false representations during the bidding process. It derives from a statement that was made in Addendum 1 to a separate contract, TC-02, which is the contract between EAP and the library for purchase of the AHUs. Notably, the TC-02 contract is not a part of the TC-05 contract, nor is Geiler a party to the TC-02 contract.

**{¶40}** In the TC-02 addendum, there is a "mechanical equipment clarifications section."  It provides a response to the question, "Does the unit have to arrive assembled or can it come crates [sic] labeled for assembly?"  The answer, in part, provides, "It is the responsibility of the manufacturer to provide the equipment components in size, orientation and configuration that will allow transport to the final installation point."  Geiler claims that it relied upon this statement (the "TC-02 statement") when it prepared its bid for the TC-05 contract.

**{¶41}** The library moved for a judgment as a matter of law on this claim,

arguing that "the [TC-05] contract controlled the case," because, by signing the contract, Geiler warranted that it had read all the bidding documents and reported any errors or inconsistencies that needed clarification prior to signing. In response, Geiler argued that its reliance on the TC-02 statement was reasonable. The trial court ultimately dismissed the claim after finding that "the case really is about the [TC-05] contract."

**{¶42}** Geiler now argues that the trial court erred as a matter of law in finding that the library's "misrepresentations were assumed into the TC-05 contract" as the TC-02 statement was made prior to the formation of the contract and the bid package obligated all bidders to "familiarize themselves with all the bidding documents including the bidding documents for other portions of the Project."

**{¶43}** However, the TC-05 contract expressly states, at the start of the contract, that it "represents the entire and integrated agreement between the parties hereto and *supersedes prior negotiations, representations or agreements*, either written or oral." (Emphasis added.)

**{¶44}** The Ohio Supreme Court has held that a contractor should not be permitted to circumvent its contract terms by virtue of labeling the action a tort. *See Universal*, 2004-Ohio-7133, at ¶ 19 (1st Dist.), citing *Foster Wheeler Enviresponse v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 367 (1997).

**{¶45}** Consistent with this principle, Geiler should not be permitted to circumvent its own contract terms by bringing a negligent-misrepresentation claim based on documents that were submitted to bidders for a separate contract prior to the date on which it entered its own contract with the library on the same subject matter.

**{¶46}** Nevertheless, even assuming Geiler could assert a claim for negligent

misrepresentation in this situation, we hold that Geiler could not, as a matter of law, have justifiably relied on the alleged misrepresentation made during the bidding process where the contract expressly put Geiler on notice to not rely on prior representations as the contract superseded any prior negotiations, representations or agreements made. *See generally Foster Wheeler* at 366, citing *R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm.*, 913 F.Supp. 1031, 1040 (N.D.Ohio 1996).

**{¶47}** Therefore, we hold that the trial court did not err in dismissing Geiler's claim for negligent misrepresentation as a matter of law. Accordingly, we overrule the second assignment of error and affirm the judgment of the trial court as to Geiler's claim for negligent misrepresentation.

### V. Conclusion

**{¶48}** Based on the foregoing, we overrule the assignments of error and affirm the judgment of the trial court.

Judgment affirmed.

**BOCK, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.